**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY REED,** | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 7361 |
| | ) | |
| v. | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **CAROLYN W. COLVIN[1], Commissioner** | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Anthony Reed, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(I), 423(d), and 1382(c). Mr. Reed asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks summary judgment affirming the decision.

## I.

### PROCEDURAL HISTORY

Mr. Reed applied for DIB and SSI on October 27, 2009, alleging he had been disabled since October 19, 2009, due to an "ataxiacerebellar" hemorrhage, constant dizziness, short term memory loss, balance problems and a speech impairment. (Administrative Record ("R.") 143–45, 185, 189). His application was denied initially and upon reconsideration. (R.81–88, 90–96). Mr. Reed filed

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

a timely request for hearing in pursuit of his claim on August 24, 2010. (R. 100). An administrative law judge ("ALJ") convened a hearing on April 15, 2011, at which Mr. Reed, represented by counsel, appeared and testified. (R. 37–73, 76–80). In addition, Dr. Richard Hamersma testified as a vocational expert. (R. 73–76). On June 14, 2011, the ALJ issued an unfavorable decision, denying Mr. Reed's application for DIB and SSI. (R. 23). The ALJ determined that despite Mr. Reed's severe limitations due to a cerebrovascular accident (stroke) and hypertension (R. 17), and despite his minimal functional limitations due to depression (R. 18), Mr. Reed's residual functional capacity allowed him to perform his relevant past work as it is generally performed. (R. 22-23).

The ALJ's decision became the Commissioner's final decision on June 15, 2012, when the Appeals Council denied Mr. Reed's request for review. (R. 6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Reed appealed that decision to the federal district court under 42 U.S.C. § 405(g), and both parties consented to jurisdiction here pursuant to 28 U.S.C. § 636(c).

## II.

### THE RECORD EVIDENCE

### A.

### Vocational Evidence

Mr. Reed was born on February 26, 1953, making him fifty-eight years old at the time of the ALJ's decision (R. 38). He lives with his wife, who works, his daughter, who goes to school and granddaughter, who goes to daycare. (R. 38-39). He completed high school and one year of college. (R. 39). He served in the United States Navy from 1970 to 1976 (R. 68). Immediately before his application for disability, Mr. Reed worked for 32 years as a maintenance engineer for a real estate company (Lake Meadows Apartments). (R. 190, 694). As a maintenance engineer his activities included walking and standing, carrying tools and equipment, climbing ladders, snow removal, gardening, repairing air conditioning units, electrical, leaks and making other necessary repairs. (R.

50–51, 175, 190). He also supervised at least five employees who did similar work (R. 51, 190), and was certified to do electrical and plumbing work. (R. 51). Mr. Reed held this position until October 2009 when he retired. (R. 44–46).

## B.

## Medical Evidence

Mr. Reed claims he suffers disability from a cerebrovascular accident (stroke), hypertension, gout and dysthemic disorder (depression). (R. 242). He claims that the effects of his physical and mental impairments, individually and in combination, have prevented him from working since October 19, 2009. (R. 189, 242). The effects of Mr. Reed's impairments allegedly include: constant dizziness and pain, short term memory loss, problems walking and standing due to imbalance and a speech impairment. (R. 204–205, 289).

Mr. Reed's relevant medical history begins in October 2006 when he was hospitalized at Northwestern Memorial Hospital after suffering a stroke. (R. 278, 666). His hospitalization lasted about three weeks, followed by speech therapy at Mercy Hospital for approximately one month in order to learn to speak again. *Id.* Thereafter, he was able to return to work. (R. 278).

In January of 2009, Mr. Reed sought treatment for a gout flareup in his right big toe. The remainder of the physical exam was normal and he had no other complaints. (R. 689). Mr. Reed returned with another gout flareup on April 3, 2009. He had pain in both feet, brought on by alcohol consumption. Once again, there were no other issues, and the balance of the physical exam was normal. (R. 685). On October 8, 2009, Mr. Reed complained of becoming easily fatigued with decreased exercise endurance, as well as some imbalance. (R. 409). Reflexes and motor strength were normal. (R. 409). Neurological exam was normal. (R. 410). PSA was elevated. (R. 410).

From January 15–17, 2010, Mr. Reed was hospitalized after he experienced dizziness. (R. 245). Mr. Reed's treating physician during his hospitalization was Dr. James Fairbairn. (R. 257). On January 15, 2010, head CT scans revealed chronic infarcts of the right cerebellum and inferior right basal ganglia. (R. 276). The scans further revealed: white matter lateral of the right basal ganglia with mild associated ex vacuo dilation of the anterior horn of the right lateral ventricle; consistent with generalized atrophy, the ventricles and cortical solci were otherwise somewhat prominent; conditions consistent with chronic ischemic small vessel disease; white matter hypodensity more pronounced in the right posterior centrum semiovale (which would also be secondary to chronic ischemic small vessel disease). (R. 275–76, 344).

Physicians were able to rule out acute cerebral bleed (a new stroke) as a cause of the dizziness. (R. 245). His blood pressure was elevated at 180/130. (R. 246, 248). Blood pressure remained high even after his dizziness went away. (R. 245). On January 16, 2010, a Cardio Echo Doppler Study revealed mild left ventricular hypertrophy with normal chamber diameter and contractility; borderline right ventricular diameter with preserved contractility; mild aortic root enlargement trivial mitral; trivial to mild pulmonic; mild tricuspid valvular regurgitation; abnormal mitral inflow and tissue Doppler indicating grade one diastolic dysfunction; mild pulmonary hypertension. (R. 340–43). Gait was steady. (R. 323).

On January 22, 2010, Dr. Rochelle Hawkins examined Mr. Reed for the Bureau of Disability Determination Services. (R.278–86). Mr. Reed provided his medical history to Dr. Hawkins, which she noted did include a stroke. (R. 278). Mr. Reed complained that he got some kind of rush every time he moved his head back. This sensation was accompanied with headaches, which lasted one or two minutes before going away. Mr. Reed denied past fainting seizure, nausea, vomiting or

gastrointestinal problems. (R. 278). Mr. Reed's blood pressure was 130/90 in left arm and 130/86 in the right arm. (R. 279) Dr. Hawkins noted Mr. Reed had normal speech – no difficulty finding a word or slurring. (R. 279). With regard to Mr. Reed's upper and lower extremities, Dr. Hawkins noted Mr. Reed had no anatomic abnormalities, no evidence of redness, warmth, thickening of effusion of any joint, no limitation of motion of shoulder, elbow, wrist, ankles, hips, or knees. (R. 279–80).

Mr. Reed's grip strength was strong and equal bilaterally; his ability to perform fine and gross manipulation with upper extremities was normal; his muscle strength in both upper and lower extremities was normal. (R. 279-80). With regard to Mr. Reed's mental status, Dr. Hawkins noted that Mr. Reed was mentally alert, pleasant, cooperative, coherent, well oriented to place, time and person; he had good hygiene, grooming, normal affect, ability to relate well and made good eye contact; his memory of recent and remote events was completely intact; his ability to concentrate was fair; and he seemed capable of handling his funds. (R. 280).

His uncorrected vision was 20/30 on the right, 20/40 on the left. (R. 286). Dr. Hawkins's diagnostic impression of Mr. Reed was: 1) status post stroke three years ago with no residual effects; 2) high blood pressure but stable at time of exam; 3) questionable dizziness/vertigo. (R. 281). He was able to sit, speak and hear without difficulty; he had some difficulty in prolonged standing, walking, lifting and carrying due to easy fatigue and dizziness; he was able to walk greater than fifty feet unassisted; and he did not use an assistive device. (R. 281).

On February 3, 2010, Dr. Frank Jimenez reviewed the medical evidence on behalf of the disability agency. (R. 287–89). He recommended that Mr. Reed's claim be denied because he found Mr. Reed's impairments or combination of impairments were not considered severe. (R. 287). In

making this recommendation, Dr. Jimenez considered the following evidence from the consultative exam on January 22, 2010: Mr. Reed's stroke, subsequent hospitalization at Northwestern and speech therapy, Mr. Reed's blood pressure reading of 130/86 in the right arm, his heart and lung sounds, speech, range of motion in all joints examined, normal gait, normal ability to bear his own wait and normal neurological portion of the exam. (R. 289). Dr. Jimenez also concluded that given the available medical evidence, Mr. Reed's symptoms were credible. (R. 289).

Mr. Reed said he was doing well on March 4, 2010. He did request medication for a pain in his foot. (R. 413). He had a consultative psychiatric exam with Dr. Robert Neufeld on July 6, 2010. (R. 201). Dr. Neufeld found that Mr. Reed was rather thin, emotionally somewhat flat—with flat and blunted affect, but that he had good eye contact with a usually linear and relevant thought stream. (R. 302). Motor movements and speech were normal. (R. 301). Remote recall was intact; immediate recall was somewhat impaired. (R. 301). IQ appeared to be in the borderline range. (R. 301). The doctor concluded that Mr. Reed had a dysthymic disorder (mild depression) and assigned him a Global Assessment of Functioning score of 65 (R. 303), denoting "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, . . . ." http://www.gafscore.com/.

On July 26, 2010, Dr. Carl Hermsmeyer reviewed the psychological evidence on behalf of the disability agency. (R. 305). Dr. Hermsmeyer determined that Mr. Reed suffered a dysthymic disorder (depression) that mildly limited Mr. Reed's activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace. (R. 305, 308, 315, 317). The next day,

Dr. James Madison, also on behalf of the disability agency, concurred in the February 2010 assessment by Dr. Jimenez. (R. 319– 21).

On August 9, 2010, Mr. Reed reported that he was feeling about the same, with some dizziness and fatigue. Exam was normal. (R. 412). From September 21–24, 2010, Mr. Reed was hospitalized at Mercy Medical Center for a rheumatology evaluation after a gout attack. (R. 524–25). At the time of admission, Mr. Reed complained of a burning sensation that was 10/10 severity. (R. 524). His left knee and left elbow were swollen and painful, requiring him to use a cane. (R. 524). X-rays of the left knee and elbow revealed soft tissue swelling and some moderate degenerative changes in the elbow. (R. 528). On discharge he had near full range of motion. (R. 532).

On April 14, 2011, the day before Mr. Reed's social security hearing, Dr. James Fairbairn filled out a form provided by Mr. Reed's attorney. (R. 694). Dr. Fairbairn reported that he had seen Mr. Reed every three months since October 30, 2007. (R. 694). The doctor related diagnoses of a cerebellar hemorrhage, hypertension, and depression. (R. 694, 696). As for as Mr. Reed's symptoms, Dr. Fairbairn checked off boxes indicating weakness, unstable walking, falling spells, pain, fatigue, headaches, difficulty remembering, confusion, depression, personality change, speech/communication difficulties. (R. 694). But, the doctor allowed that the only clinical findings were slurred speech and ataxia of gait. (R. 694). Mr. Reed's unsteady gait had resulted in several falls over the prior few months. (R. 694).

Dr. Fairbairn opined that Mr. Reed could walk no more than one block without rest, sit no more than one hour at a time, and stand for not more than 30-45 minutes at a time. (R. 693). In an 8-hour workday, Mr. Reed could only sit for a total of 2 hours and stand/walk for a total of 2 hours.

(R. 693). He would have to lie down the rest of the day, every hour. (R. 693). He used a cane periodically to walk. (R. 693). He could only occasionally lift less than 10 pounds. (R. 695). He could only use his hands to manipulate objects 20% of the day, could only reach in front of him 10% of the day and could never reach overhead. (R. 695).

Dr. Fairbairn went on to say that Mr. Reed was incapable of even low stress work; he had difficulty concentrating and focusing on tasks. (R. 696). He would be off task at least 25% of the time. (R. 696). Mr. Reed was likely to have "good days" and "bad days," and would miss more than four days of work per month. (R. 696).

The record also discloses that between February 26, 2002 and June 3, 2010 Mr. Reed underwent several examinations for prostate cancer that returned negative results. (R. 290–300). An October 8, 2009 prostate biopsy was ordered by Dr. James Fairbairn after he found Mr. Reed continued to have an elevated prostate specific antigen (PSA). (R. 293). A June 3, 2010 clinical note indicates that results from the most recent prostate biopsy were negative for malignancy although he continued to have a markedly high PSA. (R. 299–300).

## C.

### The Administrative Hearing

### 1.

### Mr. Reed's Testimony

Mr. Reed testified that his mother drove him to the hearing, although he has a driver's license and lives with his wife, daughter and granddaughter. (R. 38-39). When the ALJ asked Mr. Reed how far he had gone in school, Mr. Reed answered high school then one year of college. (R. 39). Mr.

Reed stated he had not worked since October 2009 due to a brain hemorrhage. (R. 39-43). At that time he retired and received a lump sum of roughly $6,000 from his employer. (R. 43).

The ALJ asked Mr. Reed why he stopped working in 2009, and Mr. Reed testified he could no longer work because he had a brain hemorrhage sometime around July 2008. (R. 43). After the 2008 hemorrhage Mr. Reed was off work for about six months. (R. 43-44). Then he returned to work for ten months in 2009 because he thought he could do the work. (R. 43-44). By October 2009, Mr. Reed took a retirement package because he realized could no longer perform the work due to diffused pain all over his body, a result of his stroke. (R. 44, 52-53). In 2010 he started drawing a pension of $612 per month, which is half the pension he would have been eligible to receive had he worked until age 65 (R. 45-46), but he could simply work no longer due to his condition. (R. 69-70).

At his job, he had to walk, climb ladders, take tests (work tests for certifications in plumbing and electrical) and fix things (air conditioning, electrical and plumbing). (R. 50-51). He also supervised workers who performed these repairs. (R. 51). For several years Mr. Reed worked with high blood pressure that he treated with medication that his doctor occasionally switched. (R. 58-59).

Mr. Reed testified he had doctor check-ups throughout 2009 to continue treatment for stroke related pain. (R. 53). He was prescribed medication (ibuprofen), but it was ineffective at reducing the pain that he felt all over his body, specifically in his head, arms, hands and legs. (R. 53-54). Mr. Reed testified that the pain never went away, although it diminished since 2008, and it persisted even during the Social Security hearing. (R. 54). Mr. Reed noted he was prescribed new medication the day before the hearing, but the script was yet to be filled. (R. 54-56). He said that several of his

medications caused various side effects. (R. 56-57). Those side effects caused slurred speech and made his hands shake. (R. 57). Mr. Reed also explained that he falls "a lot." (R. 58). His most recent fall was two days before the hearing, and he started falling a few years before that. (R. 58). Mr. Reed even fell at work. (R. 59).

Mr. Reed testified that "Dr. Fairbanks" – likely Dr. Fairbairn – was his treating doctor at the time of the hearing and for roughly eight years prior to the hearing. (R. 59-60). Mr. Reed stated he met with "Dr. Fairbanks" roughly every two months at the doctor's office or Mercy Hospital. (R. 59-60). The ALJ asked Mr. Reed if Mr. Reed had any other health problems and, in response, Mr. Reed explained that his doctor gave him medication for his heart the day before. (R. 61). Mr. Reed could not think of the name of his condition, but when the ALJ listed several possible heart conditions related to incorrect rhythm, he thought it was atrial flutter. (R. 61). Mr. Reed stated that he receives medication for this and he had to go to the hospital for it but couldn't remember what it was. (R. 62-63). In fact, Mr. Reed testified that he forgot a lot of things. (R. 70). This included things about his kids and wife, and that he is forgetful. (R. 71-72). For instance, Mr. Reed's wife explained to him that he forgot certain, special things about his daughter when she was born and when she was younger. (R. 71-72). When he returned to work, Mr. Reed would forget to tell his workers to do certain things. (R. 72).

Mr. Reed testified he spends his time reading, watching TV (but not too much TV), playing with his granddaughter and helping with a few chores at home. (R. 64-65). He mostly reads, whether it is at home or at the library located half of a block away from his house. (R. 65-66). Mr. Reed also plays with his granddaughter, who Mr. Reed estimated was 20-25 lbs. (R. 66). The ALJ asked if Mr. Reed picks her up, and Mr. Reed replied not often; when she tried to ride his back once he had

to put her down. (R. 67). Mr. Reed also helps his wife wash dishes; he sometimes mops the kitchen floor; and every now and then he washes and folds clothes. (R. 68).

Mr. Reed's attorney examined Mr. Reed about how his gout affects him. (R. 70). Mr. Reed testified his gout was painful, painful to walk and sometimes his feet and legs swell. (R. 71). The last gout episode Mr. Reed suffered was six months before the hearing. (R. 71). In response to his attorney's questioning about Mr. Reed's use of a cane, Mr. Reed testified that he uses a doctor prescribed cane almost every day to walk to the library because of the pain he experiences sometimes. (R. 71). The pain causes him to stumble and walk "wobbly." (R. 71).

## 2.

### The Vocational Expert's Testimony

The vocational expert ("VE"), Dr. Richard Hamersma testified that according to the Dictionary of Occupational Titles ("DOT") Mr. Reed's past work would fall under a janitor title. (R. 74). As a janitor, Mr. Reed was doing semi-skilled work, possibly at a low or high skill level depending on what certificates Mr. Reed had. (R. 74). The VE further testified that Mr. Reed actually performed the work at a heavy level of exertion, while the DOT generally characterized the job as medium work. (R. 74).

In response to the ALJ's first hypothetical, the VE testified that a person of advanced age with a high school education and the same relevant past work experience as Mr. Reed, could not perform Mr. Reed's past work as he performed it if he was limited to lifting and carrying fifty pounds occasionally and twenty-five pounds frequently, and if he was limited to being on his feet standing and walking about six hours and sitting about six hours during an eight hour work day with

normal rest periods. (R. 74–75). However, the VE testified that such a hypothetical person would be able to perform Mr. Reed's past work at the medium level. (R. 75).

The ALJ proposed a second hypothetical and asked about a person limited to work at the light level, which requires lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and walking about six hours in an eight-hour day with normal rest periods. (R. 75). VE testified that he did not believe Mr. Reed acquired a skill that he could apply to other work. (R. 75). Then, the ALJ asked if any of the restrictions listed in Dr. Fairbairn's stroke medical source statement (R. 694) would affect the hypothetical person's ability to do Mr. Reed's past work at the light level of exertion. (R. 75). The VE testified that these restrictions would have a significant effect, and that such a person would not be able to do the maintenance work that Mr. Reed actually did in the past, nor at the medium level or any other level. (R. 75–76).

### III.
### The ALJ's Decision

The ALJ found that Mr. Reed had two severe impairments: status post cerebrovascular accident (CVA) and hypertension. (R. 17). The ALJ based this determination upon his finding that these two impairments imposed more than minimal restrictions on Mr. Reed's ability to perform basic work activities. *See* 20 C.F.R. §§ 404.1520(c). The ALJ also found that Mr. Reed's alleged depression caused no more than minimal functional limitations and was therefore non-severe. (R. 18). In making this determination the ALJ considered two consultative exams, one performed by Dr. Hawkins on January 22, 2010 (which contained a mental status portion) and another, a psychological consultative examination, performed by Dr. Neufeld on July 6, 2010. (R. 18). The

ALJ further noted that the record contained no evidence of psychiatric treatment, and no psychiatric problems were noted during Mr. Reed's January 2010 hospitalization. (R. 18).

Next, the ALJ found that Mr. Reed did not have an impairment or combination of impairments that met or equaled one of the impairments listed in 20 CFR 404(P), appendix 1. (R. 18). In considering Mr. Reed's status post CVA, the ALJ determined this did not rise to listing level severity because Mr. Reed did not have either (A) a sensory or motor aphasia resulting in ineffective speech or communication, or (B) significant and persistent disorganization of motor function in two exterminates, resulting in sustained disturbance of gross and dexterous movements, or gait and station, as required under Medical Listing 11.04. (R. 18).  For this finding, the ALJ relied solely on the consultative exam by Dr. Hawkins.  (R. 18).  In considering Mr. Reed's hypertension, the ALJ determined this did not rise to listing level severity under 4.00(H) because Mr. Reed did not meet any cardiac listing and there was no evidence of end organ damage. (R. 18).

The ALJ then found that Mr. Reed had the residual functional capacity (RFC) to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), meaning that Mr. Reed could lift and carry fifty pounds occasionally and twenty-five pounds frequently, and he could be on his feet standing/walking six hours of every eight-hour workday with normal rest periods, and could also sit for six hours. (R. 19).

The ALJ explained that the RFC he arrived at was consistent with the objective medical evidence, the clinical findings and the longitudinal medical history. (R. 20). The ALJ concluded that Mr. Reed's allegations of greater pain and limitations were "not supported by the evidence as a whole," and that Mr. Reed's allegations of disabling impairments were "not credited fully due [sic] inconsistencies in the record." (R. 20). The ALJ concluded that Mr. Reed's allegations of significant

memory difficulties and speech impairments were not substantiated in the record, (R. 20), and test results showed no prostate cancer. (R. 20). The ALJ noted that Mr. Reed worked for three years after his stroke in 2006, until October 19, 2009. (R. 20). The ALJ concluded that the results of Dr. Rochelle's January 22, 2010 medical exam, which he accorded some weight, did not support Mr. Reed's allegations of severe limitations. (R. 20).

Specifically, the ALJ pointed to Dr. Rochelle's diagnostic impression that Mr. Reed was status post stroke, no residual effects and that he had questionable dizziness/vertigo. (R. 20–21). The ALJ also noted her observations that Mr. Reed had normal speech, no difficulty finding a word or slurring; he had normal range of motion in all joints examined; his muscle strength was normal in both upper and lower extremities; his fine and gross motor manipulations was normal; his gait and ability to bear his own weight was normal; the neurological portion of the exam was normal; his coordination was intact; and he was able to sit, speak and hear without difficulty. (R. 21).

The ALJ concluded that although Dr. Hawkins reported Mr. Reed had some difficulty with prolonged standing, walking, lifting and carrying due to easy fatigue and dizziness, these statements were vague and "apparently" based on Mr. Reed's subjective reports opposed to her own objective findings. (R. 21).

The ALJ assessed the medical opinion evidence presented by Dr. Fairbairn, Dr. Jimenez, Dr. Madison and Dr. Hermsmeyer. (R. 22). The ALJ assigned Dr. Fairbairn's opinion little weight because he concluded it was not well-supported by other evidence and the record contained well-supported contradictory evidence. (R. 22). Specifically, while Dr. Fairbairn allegedly saw Mr. Reed every three months since October 30, 2007, but the ALJ asserted there were no records to substantiate this claim. (R. 22). Additionally, the ALJ found Dr. Fairbairn's opinion that Mr. Reed

14

had slurred speech, ataxic gait and poor prognosis for recovery was rebutted by evidence from other treating physicians who determined Mr. Reed obtained complete functional recovery years before. (R. 22).

The ALJ supported his decision to give little weight to Dr. Fairbairn's opinion by pointing out the possibility that Dr. Fairbairn's opinion could have been an effort to assist Mr. Reed. (R. 22). The ALJ assigned moderate weight to the respective opinions of Dr. Jimenez and Dr. Madison because the evidence was generally consistent with their assessments, and in order to give Mr. Reed the "benefit of every due consideration." (R. 22). The ALJ assigned significant weight to Dr. Hermsmeyer's opinion because he agreed Mr. Reed with Dr. Hermsmeyer's assessments that Mr. Reed did not suffer from severe mental impairments and Mr. Reed's allegations in this regard were excessive. (R. 22).

The ALJ went on to conclude that Mr. Reed was capable of performing his past work as a janitor at the medium level because that did not require Mr. Reed to perform work-related activities precluded by his RFC. (R. 22). As an initial matter, the ALJ noted Mr. Reed's past relevant work, its classifications at the medium and semi-skilled levels per the DOT. Then the ALJ referenced the VE's testimony, which, he recounted as indicating that Mr. Reed could perform his work at a medium level as per the DOT classification. (R. 22). The ALJ accepted the VE's opinion, and found that Mr. Reed was capable of performing his past relevant work as it is generally performed. (R. 22). The ALJ concluded that Mr. Reed was not disabled within the meaning of the Social Security Act during the time period between the alleged onset date and the ALJ's decision.

# IV.

## DISCUSSION

### A.

### The Standard of Review

This court will uphold the Commissioner's decision if it is supported by substantial evidence and is free of legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although this standard is generous, it is not entirely uncritical, *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), and where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007); *Steele*, 290 F.3d at 940.

This court will not reweigh the evidence, make independent credibility determinations, or substitute its own judgment in place of the ALJ's. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *Weatherbee v. Astrue*, 649 F.3d 565, 568–69 (7th Cir. 2011). Rather, this court will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow a reviewing court to meaningfully assess the validity of the agency's ultimate findings. *Id.* A decision that lacks adequate discussion of the issues requires remand. *Id.* Furthermore, this court will not disturb an ALJ's credibility determinations as long as they are supported in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001).

**B.**

**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
>
> 2) does the plaintiff have a severe impairment;
>
> 3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
>
> 4) is the plaintiff unable to perform his past relevant work; and
>
> 5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512–13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step three, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts at step five to the Commissioner, who must then present evidence establishing that the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy. 42 U.S.C. § 423(d)(2)(A); *Weatherbee*, 649 F.3d at 569; *Briscoe*, 425 F.3d at 352.

**C.**

**Analysis**

**1.**

Mr. Reed points to various problems with the ALJ's decision that he contends require a remand, but as his arguments really focus on his credibility and the statements of physicians, we confine ourselves to those two facets of the ALJ's opinion. As for Mr. Reed's credibility, the ALJ determined that Mr. Reed's:

> allegations of greater pain and limitations are not supported by the evidence as a whole. Further, [Mr. Reed's] allegations of disabling impairments are not credited fully due inconsistencies [sic] in the record. [Mr. Reed's] allegations of significant memory difficulties and speech impairments are not substantiated by the record. The results of [his] objective testing show no evidence of prostate cancer. In sum, the medical evidence of record does simply not support the allegations of severe limitations.

(R. 20). Notably, the ALJ does not discuss Mr. Reed's hearing testimony, focusing entirely on written statements as to his daily activities. The ALJ does not mention any inconsistencies in these statements, and that it is impossible to ascertain what the ALJ meant by his conclusory, unamplified reference to "inconsistencies in the record. " Perhaps he meant inconsistencies between Mr. Reed's written statements and the medical evidence. But that is not at all clear. If the uninformative phrase, "inconsistencies in the record," were enough, there could never be meaningful appellate review of an ALJ's credibility determination.

What it comes down to is that the ALJ based his credibility finding entirely on the medical evidence. And, in the Seventh Circuit, that's a problem. While the Seventh Circuit has said in a general way that a claimant's credibility may be undermined by the objective medical evidence, *see, e.g., Pepper v. Colvin,* 712 F.3d 351, 368; *McKinzey v. Astrue,* 641 F.3d 884, 891 (7th Cir. 2011);

*Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005), the court has also ruled that an ALJ may not disregard a claimant's complaints of pain solely because they are belied by the objective medical evidence. *See, e.g., Moore v. Colvin,* 743 F.3d 1118, 1125 (7th Cir. 2014); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). Perhaps these rulings might be harmonized by taking the court to mean that the ALJ can point to the medical record as undermining a claimant's testimony only when the ALJ provides additional reason for doubting it. Still, the court has seemingly upheld credibility determinations based solely on the objective medical evidence on a number of occasions. *See, e.g., Outlaw v. Astrue*, 412 Fed.Appx. 894, 896 (7th Cir. 2011); *Getch*, 539 F.3d at 483; *Adkins v. Astrue*, 226 Fed.Appx. 600, 606 (7th Cir. 2007); *Sienkiewicz*, 409 F.3d at 804. But, it would be improper to uphold a credibility determination based on nothing more than the medical evidence given recent cases like *Moore* or *Pierce*.

And so, the ALJ's credibility determination cannot be upheld here. The ALJ concerned himself with the medical evidence alone. He did mention Mr. Reed's written statements regarding his daily activities, but provided no further discussion and that kind of non-analysis is not enough. All the ALJ said was that Mr. Reed washes dishes, cleans the bathroom, goes outside once or twice a day, drives a car, walks, and reads the newspaper. So what. The ALJ did not indicate that he thought Mr. Reed's daily activities were far too rigorous for a man with his alleged limitations, or suggested on any level that Mr. Reed can perform medium work. That's probably just as well, for while the Seventh Circuit has acknowledged that it is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility, it has repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time. *See, e.g. Roddy v. Astrue*, 705 F.3d 631, 639

(7th Cir. 2013); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir.2011); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir.2009); *Gentle v. Barnhart*, 430 F.3d 865, 867–68 (7th Cir.2005); *but see, e.g., Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010)(court refused to overturn ALJ's credibility determination even where claimant's ability to do chores was limited); *Flint v. Colvin*, 543 Fed.Appx. 598, 600 (7th Cir. 2013)(ALJ's credibility determination upheld even though plaintiff could only perform "some" chores and had to care for her husband who was a stroke victim).

In this instance, even the written statements the ALJ focused on include limitations. For example, Mr. Reed did go on walks, but only once a week and he could walk no more than a block before he had to rest. (R. 180-81). He did wash the dishes and clean the bathroom, he did such chores only 2-3 times a week for about 15 minutes. (R. 198). But this is essentially to say that he is alive, not that he can work. As already noted, the ALJ ignored Mr. Reed's hearing testimony altogether. A the hearing, he testified to limitations on his activities, too. And he added that he forgot a lot of things, had difficulty picking up his 25-pound granddaughter and did so rarely, and spent most of his time reading and watching TV. He was wobbly when he walked and had to use a cane. Yet, the ALJ concluded he could lift and carry fifty pounds at work. and that he could lift and carry twenty-five pounds frequently, and he could be on his feet standing/walking six hours of every eight-hour workday with normal rest periods, and could also sit for six hours. (R. 19).

The ALJ also seemed to think it was significant that Mr. Reed went back to work after his stroke. It was, but not in the way the ALJ thought. Mr. Reed explained that when he suffered his stroke, he was off work for six months. When he returned, he wasn't the same. He fell sometimes at work and forgot things and, eventually, he couldn't do the job anymore and was forced to take an early retirement package, that resulted in significantly reduced benefits. Mr. Reed had worked

for over three decades and stood to double his retirement package had he stayed on several more years. That's the type of thing that ought to bolster a claimant's credibility, not detract from it.[2] An ALJ can't simply ignore a claimant's hearing testimony, and certainly not in the manner the ALJ did here, and then implicitly and without even an attempt at a reasoned explanation, reject everything the claimant says. Accordingly, this case must be remanded to the Commissioner.

**2.**

Although Mr. Reed's remaining arguments need not be addressed, it is worthwhile to comment on the ALJ's treatment of the medical opinions in this case. The ALJ completely disregarded the opinion from Mr. Reed's treating physician – perhaps with good reason – and gave "some weight" to the consultative examiner's opinion. He also accorded moderate weight to the opinions of the physicians who merely reviewed the record. The hierarchy, then, goes in descending order from doctors who never saw Mr. Reed, to a doctor who saw him once, to a doctor who treated him regularly for three years or more. This seems to turn things on its head, as Mr. Reed points out. *See* SSR 96-6p, 1996 WL 374180, 2 ("The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."). But it doesn't necessarily scuttle the ALJ's opinion

An ALJ need not accept a doctor's opinion – even a treating doctor's opinion, but if he rejects it, he must provide good reasons for doing so. *Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th

---

[2] It is true that the Seventh Circuit has said that a claimant is not entitled to a presumption of credibility based on a long work history, *Jones v. Apfel*, 234 F.3d 1273 (Table), at *2 (7th Cir.2000). Yet, it is a factor that ought to be considered, SSR 96-7p, 1996 WL 374186, 5, and certainly should not be used against a claimant under these circumstances, if that is indeed what the ALJ meant to do.

Cir. 2011). Here, the ALJ rejected the opinion of Mr. Reed's treating physician, Dr. Fairbairn, because there was no evidence that the doctor treated Mr. Reed every 3 months as he said, it was contrary to the medical evidence, and it was likely Dr. Fairbairn was merely assisting a patient with whom he sympathized. Those are all valid reason for discrediting a doctor's opinion. *See Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)(consistency with the record and supported by clinical findings); *Skarbek v. Barnhart*, 390 F.3d 500, 503–04 (7th Cir.2004)(consistency); *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)("many physicians . . . will often bend over backwards to assist a patient in obtaining benefits."); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)("[t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

Mr. Reed complains that the ALJ didn't go through all the factors applicable to assessing doctors' opinions, but he didn't have to. An ALJ doesn't have recite the considerations applicable to assessing a medical opinion chapter and verse; it is enough that he minimally articulates his reasons and they are supported in the record. *Henke v. Astrue*, 2012 WL 6644201, 3 (7th Cir. 2012); *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir.2008).

The reasons the ALJ provided are supported by the record. Dr. Fairbairn filled out a form that, essentially, depicted Mr. Reed as an invalid. There is no evidence in the record to support his very dire assessment with a laundry list of issues. For example, Mr. Reed's problems seem to be limited to walking, dizziness, and intermittently slurred speech. Yet, Dr. Fairbairn indicates that he has nearly no use of his hands at all. It is anyone's guess where that comes from, because it is never mentioned anywhere else in the record. Dr. Fairbairn himself admits that the only problems he has observed during his treatment of Mr. Reed are ataxic gait and slurred speech. It was certainly not

inappropriate for the ALJ to reject his findings and muse that he might simply be trying to help Mr. Reed get benefits – or in the words of the Seventh Circuit, "to bend over backwards" to help his patient. *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7ᵗʰ Cir. 2006)("many physicians (including those most likely to attract patients who are thinking of seeking disability benefits, . . . will often bend over backwards to assist a patient in obtaining benefits.").

As for Dr. Hawkins, the ALJ gave her statement "some weight" because her statement was vague and apparently based on [Mr. Reed's] subjective reports as opposed to her own objective findings." (R. 21). It's not clear what the ALJ meant be her statement being "vague," but her statement did conflict with her rather benign examination findings. An ALJ may discount a physician's opinion if it is internally inconsistent. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7ᵗʰ Cir. 2007). That's what the ALJ did here, although the phrasing he used left much to be desired.

## CONCLUSION

The plaintiff's motion for remand [Dkt. #19] is GRANTED, and the Commissioner's motion for summary judgment [Dkt. #21] is DENIED.


**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE: 8/1/14**